## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| Kevin McFadden, David Schmidt and Peter Doncevic on behalf of himself and all others similarly situated,<br><br>               Plaintiff,<br><br>      vs.<br><br>Sprint Communications, LLC, the Sprint Communications Employee Benefits Committee and John/Jane Does 1-5,<br><br>             Defendants. | Case No.: 2:22-cv-2464-DDC-GEB<br><br><br><br><br><br>**CORRECTED FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs, Kevin McFadden, David Schmidt and Peter Doncevic, through their attorneys, on behalf of himself and all others similarly situated, allege:

### INTRODUCTION

1.      This is a class action against Sprint Communications, LLC ("Sprint"), Sprint's Employee Benefits Committee (the "Committee"), and the Committee's individual members (collectively, "Defendants") concerning the failure to pay joint and survivor annuity ("JSA") benefits under the Sprint Retirement Pension Plan (the "Plan") in amounts that satisfy the actuarial equivalence requirements in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").  By failing to pay JSA benefits in amounts that are actuarially equivalent to the single life annuities offered to participants under the Plan, Defendants have and will continue to cause retirees to lose part of their vested retirement benefits in violation of ERISA.

2.      Sprint sponsors the Plan.  Participants earn retirement benefits under the Plan in the form of a single life annuity ("SLA"). An SLA provides participants with monthly payments for the rest of their lives when they retire.

3.      The Plan also offers participants several joint and survivor ("JSA") options. A JSA is an annuity for the participant's life with a contingent annuity payable to the participant's beneficiary (usually a spouse) for the life of the beneficiary, which is expressed as a percentage of the amount paid during the participant's life.  The Plan offers 33, 50, 75 and 100 percent JSAs. The 33 1/3% JSA pays the spouse one-third of the amount that was paid to the participant before the participant's death; the 50% JSA pays the spouse one-half; the 75% JSA pays the spouse three quarters; and a 100% JSA pays the same amount.  Mr. Schmidt is receiving a 50% JSA. Messers. McFadden and Doncevic are each receiving a 100% JSA.

4.      The monthly benefit payable as a JSA, regardless of the percentage, will be less than the amount payable as an SLA because the JSA accounts for the likelihood that the Plan will have to pay benefits for a longer period if a participant dies before the spouse.  ERISA limits the extent to which a plan can reduce certain JSA benefits below a participant's SLA benefits. Under ERISA § 205(d), JSAs between 50% and 100% must be at least the actuarial equivalent of the participant's SLA.  Two benefit options are actuarially equivalent when they have the same present value, calculated using the same, reasonable actuarial assumptions.

5.      Calculating present value requires inputting actuarial assumptions concerning projected mortality and interest rates.  Mortality tables for the participant (and, in the case of a JSA, the participant's beneficiary) predict how long the participant and beneficiary will live to account for the likelihood of each future benefit payment being made.  Over the last several decades, mortality rates have generally improved with advances in medicine and better collective

lifestyle habits.  People who retired recently are expected to live longer than those who retired in previous generations.  Older mortality tables predict that people near (and after) retirement age will die at a faster rate than current mortality tables.  As a result, using an older mortality table decreases the present value of a JSA and — interest rates being equal — the monthly payments retirees receive.

6.      The interest rate assumption accounts for the time value of money — the idea that a dollar in hand today is worth more than a dollar paid in a year, or in ten years — and discounts the value of expected future payments to the present.  Like mortality, the interest rate affects the calculation.  Using lower interest rates — mortality rates being equal — decreases the present value of JSA benefits.

7.      To determine the amount of a benefit, mortality and interest rate assumptions, **together**, generate a "conversion factor," which is expressed as a percentage of the benefit being compared.  Accordingly, the actuarial assumptions used to generate the conversion factor directly impact the amount of benefits that participants and their beneficiaries receive each month.

8.      The conversion factor can also be calculated by dividing the actual amounts payable under the plan.  For example, if a JSA benefit pays $900 a month and the SLA pays $1,000 a month, the conversion factor would be .90.  If the conversion factor between a JSA and an SLA is lower than the conversion factor that would be generated using reasonable mortality and interest rate assumptions, then the JSA will not be "actuarially equivalent" to the SLA.  Accordingly, the conversion factor (and the actuarial assumptions used to generate it) determine whether two benefit forms are actuarially equivalent.

9.      Plans can also use fixed tabular factors to calculate JSA benefits. Tabular factors are the conversion factors presented in table format to distinguish between the factors that apply

for different forms (e.g., 50% JSA, 100% JSA, etc.) and at different ages (e.g., age 55, 65, etc.). The Plan uses tabular factors to calculate JSAs.  For example, the Plan multiplies the participant's SLA by 0.87 to calculate a 50% JSA and a factor of .77 to calculate a 100% JSA for 65-year-old participants.  If the participant was entitled to an SLA of $1,000 per month, he or she would receive $870 per month as a 50% JSA and $770 a month as a 100% JSA under the Plan.

10.     The Plan's tabular factors for JSAs were determined using the UP 1984 mortality table (the "UP-84") with a 7-year setback for beneficiaries and a 6.5% interest rate.  The UP-84 overstates mortality rates because it is based on data that is 50 years old. The 7-year setback further reduces the conversion factors because it treats beneficiaries as being younger than their actual age (e.g., age 58 instead of age 65).  These assumptions produce conversion factors that generate JSAs that are lower than those generated by reasonable actuarial assumptions.  Indeed, Sprint has not changed the Plan's conversion factors for the 50% or 100% JSAs that the Plaintiffs are receiving in at least twenty years.

11.     By using flawed formulas for calculating JSA benefits — based on antiquated, unreasonable actuarial assumptions — Defendants depress the present value of JSAs, resulting in monthly payments that are materially *lower* than they would be if Defendants used conversion factors based on up-to-date, reasonable actuarial assumptions. In sum, Defendants are causing Plaintiffs and Class Members to receive less than they should in pension benefits each month, which will continue to affect them throughout their retirements.

12.     Accordingly, Plaintiffs seek an order from the Court (1) declaring that the conversion factors used to determine JSA benefits under the Plan produce benefits that are less than the actuarial equivalent of the SLA offered to participants; (2) requiring Defendants to pay all amounts improperly withheld in the past and to be withheld in the future; (3) requiring

Defendants to recalculate Plaintiffs' JSA benefits in a manner consistent with ERISA's actuarial equivalence requirements; (4) requiring Defendants to increase the amounts of Plaintiffs' future benefit payments; and (5) such other relief as the Court determines to be just and equitable.

**JURISDICTION AND VENUE**

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

14.    This Court has personal jurisdiction over Defendants because they each transact business in, or reside in, and have significant contacts with this District, and because ERISA provides for nationwide service of process.  Defendant Sprint is headquartered in this District, and, upon information and belief, the Committee and its members are also based in this District.

15.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Sprint does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**PARTIES**

**Plaintiffs**

16.    Plaintiff Kevin McFadden is a Plan participant who worked for Sprint for over 26 years.  Mr. McFadden began receiving his Plan benefits as a 100% JSA, with his spouse as the beneficiary, in 2017.

5

17.     Plaintiff David Schmidt is a Plan participant who worked for Sprint for 45 years. Mr. Schmidt began receiving his Plan benefits as a 50% JSA, with his spouse as the beneficiary, in 2022.

18.     Plaintiff Peter Doncevic is a Plan participant who worked for Sprint for 19 years. Mr. Doncevic began receiving his Plan benefits as a 100% JSA, with his spouse as the beneficiary, in 2021.

**Defendants**

19.     Sprint is a limited liability company that is headquartered and has its principal place of business in Overland Park, Kansas.  Sprint is a wholly-owned subsidiary of T-Mobile US, Inc. Sprint sponsors the Plan and has the right to amend or terminate the Plan.

20.     Upon information and belief, the Committee is an unincorporated association based in Overland Park, Kansas.  The Committee is the Plan's "named fiduciary" and the "Plan Administrator" under ERISA §§ 402(a)(2) and 3(16)(A), 29 U.S.C. §§1102(a)(2) and 1002(16)(A).

21.     John/Jane Does 1-5 are the individual members of the Committee responsible for administrating the Plan during the Class Period.  Their names and identities are not currently known.

## APPLICABLE ERISA REQUIREMENTS

### *Pension Benefit Options Must Be Actuarially Equivalent*

22.     ERISA requires that defined benefit plans pay married participants and their beneficiaries in the form of a qualified JSA (a "QJSA") unless the participant, with the consent of his or her spouse, elects an alternative form of payment. This makes the QJSA the default benefit for employees who are married.  *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

6

23.     ERISA defines a QJSA as an annuity for the life of the participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse.  ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).  A QJSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(1).  *Id.*  Accordingly, a plan can offer multiple QJSA options; that is, JSAs that pay survivor benefits between 50% to 100%. *Id.*  A QJSA must be actuarially equivalent to an SLA.  *Id.*

24.     Pension plans must also offer participants at least one other form of survivor annuity, known as a qualified optional survivor annuity ("QOSA").  *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2).  A QOSA is similar to a QJSA, except that the QOSA's survivor annuity percentage must be: (a) greater than 75% if the QJSA's survivor annuity percentage is less than 75%; and (b) 50% if the QJSA's survivor annuity percentage is greater than 75%.  The definition of a QOSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(2).  ERISA requires that QOSAs be actuarially equivalent to an SLA.  *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).

25.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA").  ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2).  A QPSA is an annuity for the life of the vested participant's surviving spouse (*i.e.*, a beneficiary) if the participant dies before reaching the plan's normal retirement age.  ERISA § 205(e), 29 U.S.C. § 1055(e).  A QPSA must be actuarially equivalent to the benefit the surviving spouse would have received under the plan's QJSA. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

26.     Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205, which concerns alternative forms of benefits.  *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001.

27.     The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)) provide that a QJSA "must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan." 26 C.F.R. § 1.401(a)-11(b)(2). Indeed, a QJSA "must be as least as valuable as any other optional form of benefit under the plan at the same time."  26 C.F.R. § 1.401(a)-20 Q&A 16.  Accordingly, if a plan offers other benefit options that are more valuable than the SLA, the QJSA must be at least as valuable as the most valuable form of those benefit options.  The regulations regarding QJSAs apply "when the participant attains the earliest retirement age under the plan."  26 C.F.R. § 1.401(a)-20 Q&A 17.

28.     ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement.  *See* ERISA § 205(g), 29 U.S.C. § 1055(g).  But if they do, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the present value of the lump sum be at least equal to the present value of the participant's benefits determined using the applicable mortality table (the "Treasury Mortality Table")[1] and applicable interest rates (the "Treasury Interest Rate")[2] (collectively, the "Treasury Assumptions"). The Treasury Assumptions are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) and are based on current market rates and mortality assumptions.  *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).

---

[1] *See* 26 C.F.R. § 1.430(h)(2)-1.
[2] *See* 26 C.F.R. § 1.430(h)(3)-1.

8

29.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable.

30.     The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

### *Reasonable Factors Must Be Used When Calculating Actuarial Equivalence*

31.     "Two modes of payment are actuarially equivalent when ***their present values are equal*** under a given set of assumptions."  *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield").[3]

32.     Under ERISA, "present value" must "reflect anticipated events."  Present value adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed several Regulations describing how present value should reasonably reflect anticipated events, including:

(a)     The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

---

[3] According to Merriam Webster: "Equivalent" means "equal." *See* https://www.merriam-webster.com/dictionary/equivalent.    "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

(b)      A plan must determine optional benefits using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c)      The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added).

(d)      With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using ***reasonable actuarial assumptions*** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

33.      The Regulations also rely on the standards of the Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability").

34.      Like the Regulations and ERISA's definition of "present value," the Actuarial Standards of Practice ("ASOPs") issued by the Actuarial Standards Board ("ASB")[4] of the American Academy of Actuaries (the "Academy"), require actuaries to use "reasonable assumptions." *See* ASOP No. 27, § 3.6 ("each economic assumption used by an actuary

---

[4] The ASB, an independent entity created by the Academy in 1988, serves as the single board promulgating standards of practice for the entire actuarial profession in the United States. The ASB was given sole authority to develop, obtain comment upon, revise, and adopt standards of practice for the actuarial profession.

should be reasonable"); *see also* ASOP No. 35, § 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

35.     Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "***special attention must be paid to the actuarial assumptions underlying the computations***." *Pizza Pro Equip. Leasing v. Comm. of Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd,* 719 Fed. Appx. 540 (8th Cir. 2018).  As the Ninth Circuit stated in *McDaniel v. Chevron Corp.,* 203 F.3d 1099, 1110 (9th Cir. 2000):

> The most important consideration in preparing and selecting a mortality table to be used in calculating pension benefits is whether the population from whom the mortality experience is developed is sufficiently broad and has characteristics that are typical of the plan's participants.

36.     The court explained in *Dooley v. Am. Airlines, Inc.* that each assumption used in an actuarial equivalence determination must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity.  The term actuarially equivalent means equal in value to the present value of normal retirement benefits, ***determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate***.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at * 10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

37.     Actuarial equivalence should be "cost-neutral," meaning that neither the plan nor participants should be better or worse off if participants select an SLA or a JSA.  *See Bird v. Eastman Kodak Co.*, 390 F.Supp.2d 1117, 1118–19 (M.D. Fla. 2005).

38.     "Periodically, the assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment."  Schwartzmann & Garfield at 11; *see also Smith v. Rockwell Automation*, No. 19-CV-0505, 2020 WL 620221, * 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination.").

## SUBSTANTIVE ALLEGATIONS

### I.     The Plan

39.     The Plan provides retirement benefits to full and part-time employees of Sprint (and certain affiliated companies) who were employed on or before August 10, 2005. The Plan has been closed to new participants since August 11, 2005, and benefit accruals have been frozen since December 31, 2005.

40.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

41.     Under the Plan, participants accrue benefits in the form of an SLA based on their average compensation and years of service during designated periods.   When they retire, participants can also receive their benefits as a JSA in percentages of 33 1/3, 50%, 75%, and 100%. The 50%, 75%, and 100% JSAs are subject to the actuarial equivalence requirement in ERISA § 205(d), 29 U.S.C. § 1055(d).

42.     The Plan uses tabular factors to convert a participant's SLA to a JSA based on the participant's age and the percentage of survivorship benefit that the JSA provides. The Plan's tabular factors for JSAs were calculated using the UP-84 mortality table with a 7-year setback for beneficiaries (the "UP-84 with setbacks") and a 6.5% interest rate. Sprint represents that the JSA

benefits produced by the Plan's factors provide an "Equivalent Actuarial Value" and that JSAs are "determined in such a way that the total benefit is of equivalent value to the [SLA]." Chart 1, below, shows the factors that Defendants use to calculate JSAs at various participant ages:

**Chart 1: Sample of the Plan's Tabular Factors Used to Calculate JSAs**

| Participant Age | 50% JSA | 75% JSA | 100% JSA |
|---|---|---|---|
| 55 | 0.91 | 0.86 | 0.83 |
| 60 | 0.89 | 0.84 | 0.80 |
| 65 | 0.87 | 0.81 | 0.77 |

43.     As shown in Chart 1, the Plan applies a 0.87 factor to a 65-year-old's SLA to calculate a 50% JSA and a .77 factor to calculate the same participant's 100% JSA. If that participant's SLA was $1,000 per month, his 50% JSA would be $870 and his 100% JSA would be $770 per month. The factors applied to the SLA are also adjusted based on the beneficiary's age. For each year in excess of five that the beneficiary is younger (older) than the employee, half a percentage is subtracted (added).

## II.     The Plan's JSAs Do Not Satisfy ERISA's Actuarial Equivalence Requirements

### A.     Actuarial Assumptions Used to Determine Actuarial Equivalence Must Be Reasonable as of the Date Benefits Are Calculated

44.     As discussed above, to compare the present values of two benefit options offered to a plan participant at the time she begins collecting benefits, it is necessary to determine the present values of the ***aggregate*** (*i.e.,* total) future benefits the participant (and, if applicable, the beneficiary) is expected to receive under each form using actuarial assumptions that are reasonable as of that date. There are two main components of these present value calculations: (1) an interest rate and (2) the mortality table applied to participants and beneficiaries.

45.     An interest rate is used to determine the present value of each future payment. This is based on the time value of money, meaning that money available now is worth more than the

same amount in the future due to the ability to earn investment returns.  The rate is often called a "discount rate" because it discounts the value of a future payment.  *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003).  ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent.").

46.      The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, ERISA §§ 205(g)(3)(B)(iii) and 303(h)(2), 29 U.S.C. §§ 1055(g)(3)(B)(iii) and 1083(h)(2).

47.      As alleged above, under § 3.6 of ASOP No. 27,[5] "each economic assumption used by an actuary should be reasonable."[6] An assumption is deemed "reasonable" if it "takes into account historical and current economic data that is relevant as of the **measurement date**," and "reflects the actuary's estimate of future experience." *See* ASOP No. 27, § 3.6 (emphasis in original).  The Treasury Interest Rates are reasonable because they are updated to reflect current economic conditions.

48.      A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

49.      More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth.  The SOA, an independent actuarial group, publishes the mortality tables that are the most widely used by defined benefit plans when doing

---

[5] Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield); *see also McDaniel*, 203 F.3d at 1110 (citing American Academy of Actuaries' publication).

[6] Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/

these calculations.  The SOA published mortality tables in 1971 (the "1971 GAM"), 1976 (the "UP 1984"), 1983 (the "1983 GAM"), 1994 (the "1994 GAR"), 2000 (the "RP-2000"), 2014 ("RP-2014"), and 2019 (the "Pri-2012") to account for changes to the population's mortality experience.

50.     Since at least the 1980s, the life expectancies in mortality tables have been on an upward trend as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1. According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would substantially increase projected morality and, therefore, increase pension liabilities by 7%.

51.     Under § 3.5.3 of ASOP 35, mortality tables must be adjusted on an ongoing basis to reflect improvements in mortality.[7]

---

[7] *See* http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement

52. Accordingly, in the years between the publication of a new mortality table, mortality rates are "projected" to future years to account for expected improvements in mortality.[8] For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality since publication of the table. IRS Notice 2016-50.[9]  In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014. IRS Notice 2017-60.[10]

53. For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C § 1002(27).  The Treasury Mortality Tables are updated to reflect recent mortality data from participants in private pension plans. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).  Accordingly, the Treasury Assumptions are reasonable.

54. Using a reasonable interest rate and mortality table, the present values of the SLA and the other forms of benefit can be compared to determine whether those forms of benefit are actuarially equivalent to the SLA.  Pension plans must use reasonable interest rates and mortality tables to evaluate whether the present values of benefit options produce actuarially equivalent benefits for participants and beneficiaries.

> **B.** **The Plan's Formulae Do Not Produce Actuarially Equivalent JSA Benefits in Violation of ERISA.**
>
> **1.** **The Plan Uses Unreasonable Conversion Factors to Calculate JSAs**

---

[8] Life expectancies with a projection scale assume a generational projection of future mortality improvements (i.e., life expectancies increase with year of birth).

[9] *See* https://www.irs.gov/pub/irs-drop/n-16-50.pdf.

[10] *See* https://www.irs.gov/pub/irs-drop/n-17-60.pdf.

55.     The Plan's tabular factors — based on the UP-84 with setbacks and 6.5% — do ***not*** produce QJSAs or QOSAs that are actuarially equivalent to the SLA offered to participants when they commence benefits under the Plan because the present values of the JSAs are lower than the present values of the SLAs.

56.     Defendants' use of factors based on these actuarial assumptions was unreasonable because the UP-84 is outdated and does not "reflect anticipated events" (i.e., the anticipated mortality rates of participants). The UP-84 was published in 1976 and is based on data from the 1960s that does not incorporate improvements in life expectancy that have occurred since that time. For example, a 65-year-old male is expected to live an additional 15.4 years (i.e., until age 80.4) under the UP-84 but an additional 21.6 years (i.e., until age 81.6) under the RP-2014. Thus, the average employee expects to receive, and the average employer expects to pay, benefits for a substantially longer period given the improvements in mortality that have occurred since the UP-84 was published. Because the UP-84 overstates mortality rates, it results in lower conversion factors than those produced using a reasonable mortality assumption. The setbacks that Sprint used to generate the Plan's tabular factors fails to incorporate the improvements in mortality that have occurred and artificially reduces the conversion factor by using an age that is lower than the beneficiary's actual age.

57.     The Plan's conversion factors used to calculate 50% and 100% JSAs have not been changed in at least twenty years and the factors used to calculate the Plan's 75% JSA are based on the same outdated assumptions.  Each of the factors used to calculate JSAs is unreasonably low compared to those generated using reasonable actuarial assumptions. These factors produce benefits that are not actuarially equivalent to the amount of the SLA benefit.  This is true for each

participant that selects a 50%, 75% or 100% JSA under the Plan, regardless of the participant's age or when benefits commenced.

58.    Chart 2, below, compares the benefits for a 60-year-old with an SLA of $1,000 per month to various forms of JSA benefits using the Plan's tabular factors and factors generated using the Treasury Assumptions that applied in 2017.

**Chart 2: 60-Year-Old at Benefit Commencement Date**

| Benefit Form | Monthly Benefit Under the Plan | Conversion Factors Using Treasury Assumptions | Benefit Amount Using Treasury Assumptions | Monthly Difference | Percent Difference |
|---|---|---|---|---|---|
| 50% JSA | $890 | .93754 | $937.54 | $47.54 | 5.34% |
| 75% JSA | $840 | .90914 | $909.14 | $69.14 | 8.23% |
| 100% JSA | $800 | .88242 | $882.42 | $82.42 | 10.30% |

59.    Chart 3, below, compares the benefits produced by the Plan's factors to the factors generated by the Treasury Assumptions that applied in 2017 for a 65-year old that earned an SLA of $1,000 a month.

**Chart 3: 65-Year-Old at Benefit Commencement Date**

| Benefit Form | Monthly Benefit Under the Plan | Conversion Factors Using Treasury Assumptions | Benefit Amount Using Treasury Assumptions | Monthly Difference | Percent Difference |
|---|---|---|---|---|---|
| 50% JSA | $870.00 | .92300 | $923.00 | $53.00 | 6.09% |
| 75% JSA | $810.00 | .88879 | $888.79 | $78.79 | 9.73% |
| 100% JSA | $770.00 | .85702 | $857.05 | $87.02 | 11.30% |

60.    As Charts 2 and 3 demonstrate above, the Plan's conversion factors are *substantially lower* (i.e., worse for participants) than those generated using reasonable actuarial

18

assumptions such as the applicable Treasury Assumptions. While the amount of the loss suffered will vary depending on the ages of the participant and beneficiary at the time of retirement, and on the percentage of the JSA, all participants receiving 50%, 75%, and 100% JSAs under the Plan are not receiving actuarially equivalent forms of benefit because the present values of those benefits are not equal to the present values of the SLAs they could have taken at the times they retired.

61.     By applying these factors — based on unreasonable, antiquated actuarial assumptions (i.e., the UP-84 with setbacks and the 6.5% interest rate) — to calculate participants' JSAs, Defendants are causing participants to receive lower monthly payments than they should be receiving had reasonable formulae, based on contemporary conditions at the time participants retired, were used.

62.     Defendants exacerbated the differences between mortality rates in the UP-84 and current mortality tables by using a 7-year setback for participants, which further decreases the conversion factor.

63.     A "setback" subtracts a specified number of years from a standard mortality table for purposes of calculating benefits. For example, if there is a 65-year-old retiree who has a spouse that is also 65, but the plan states that there is a 5-year setback for beneficiaries, then, for purposes of calculating benefits, the plan uses age 60 for the beneficiary's age.

64.     The Plan's 7-year setback for beneficiaries reduces the conversion factor below what it would have been if no setback had been applied. The "setback" modification, accordingly, exacerbates the injury caused by using the antiquated UP-84.

65.     The 7-year setback is not reasonable because the age difference between Plan participants and their spouses is typically less than 7 years and does not reflect participants' spouses' anticipated mortality when used with the UP-84. If Sprint had used a reasonable mortality

assumption, such as the one it uses to calculate the Plan's liabilities, it would not need to use a setback, especially an unreasonable one like the 7-year setback that the Plan uses.

### 2. Sprint Regularly Updated the Actuarial Assumptions Used to Calculate the Plan's Liabilities

66.    For purposes of its filings with the U.S. Securities and Exchange Commission ("SEC"), Sprint used reasonable, contemporary actuarial assumptions to calculate the present value of its benefit obligations under the Plan.  Specifically, Sprint's audited financial statements are prepared in accordance with the Generally Accepted Accounting Principles ("GAAP"), pursuant to which, actuarial assumptions must reflect the "best estimate" for that assumption as of the current measurement date.[11]

67.    During all relevant times, Sprint used reasonable mortality tables to calculate its pension liabilities. For example, in 2014, the SOA released updated mortality tables labeled the

---

[11] For example, as noted in a "Financial Reporting Alert" by Deloitte:

> This publication highlights some of the important accounting considerations related to the calculations and disclosures entities provide under U.S. GAAP in connection with their defined benefit pension and other postretirement benefit plans.
>
> ***
>
> **Mortality Assumption**
>
> …Frequently, actuaries recommend published tables that reflect broad-based studies of mortality.  Under ASC[11] 715-30 and ASC 715-60, **_each assumption should represent the "best estimate" for that assumption as of the current measurement date_**. Entities should consider whether the mortality tables used and adjustments made (*e.g.*, for longevity improvements) are appropriate for the employee base covered under the plan.

*See* Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 21-3, December 3, 2021, at 6 (emphasis added).

RP-2014, which Sprint immediately adopted, along with the MP-2014 improvement scale.[12] Similarly, in 2019, when the SOA released the Pri-2012 morality tables, Sprint adopted those tables to calculate the Plan's liabilities.[13]

68.     Sprint consistently updated the mortality assumptions used to calculate the projected benefits costs associated with the Plan based on the SOA's current publications.  In sharp contrast, for participants that select JSAs, Sprint continued to (and still does) use formulae based on the UP-84 with setbacks to determine actual benefits.

69.     Sprint's methodology for determining the discount rate used to calculate the actuarial present value of benefit obligations under the Plan also reflects current economic conditions. When determining the appropriate discount rate, the SEC staff guidance recommends that plans "use discount rates to measure obligations for pension benefits . . . *that reflect the then current level of interest rates*."[14] The discount rates that Sprint used to calculate the actuarial present value of the Plan's liabilities since 2012 are shown below.

| Year (ending March 31) | Discount Rate |
|:---:|:---:|
| 2012 | 4.3% |
| 2013 | 5.3% |
| 2014 | 4.9% |
| 2015 | 4.2% |
| 2016 | 4.3% |
| 2017 | 4.3% |
| 2018 | 4.1% |
| 2019 | 4.1% |

[12] *See* the Plan's Notes to Financial Statements as of November 30, 2014, at 7.
[13] *See* the Plan's Notes to Financial Statements as of November 30, 2019, at 7.
[14] *See* Deloitte, Financial Reporting Considerations, at 3 (emphasis added).

70. Throughout the relevant period, Sprint used updated actuarial assumptions in its financial statements to report a greater liability for the benefits the Plan paid out to participants than those used in the formulae for determining the JSA benefits that were actually paid to participants. There is no reasonable justification for Defendants to use the UP-84 with setbacks and a 6.5% interest rate, which produce conversion factors that generate unfairly low JSA benefits actually paid to participants, while at the same time using up-to-date, reasonable actuarial assumptions that reflect the contemporary conditions for projecting benefit costs in annual financial reporting. Because these two analyses — determining Plan liabilities and determining plan benefits actually paid to participants — measure the payment of the same benefit streams over the length of the same lives, they should be determined using the same actuarial assumptions.

71. "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit . . . 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. PriceWaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000). The Plan's formulae for determining JSA benefits do ***not*** reflect "characteristics that are typical of the plan's participants." *McDaniel*, 203 F.3d at 1110.

72. During the relevant period, Defendants used fixed factors, based on antiquated and unreasonable actuarial assumptions, to generate JSA benefits that were lower than the factors generated by reasonable actuarial assumptions. Had the Plan used factors based on reasonable actuarial assumptions, such as the Treasury Assumptions, that Sprint used to calculate the Plan's liabilities, or a combination of the two, Plaintiffs and the Class would have received, and would

continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

73.     Discovery will likely show that Defendants' use of unreasonable factors to generate JSA benefits deprived retirees and their spouses of millions of dollars.

74.     Plaintiff Kevin McFadden started receiving benefits at age 64 and his wife was age 57.  He selected a 100% JSA, which pays $876.47 a month.  His benefits were calculated by multiplying the SLA he was offered, $1,135.77, by 0.7717, the result of the Plan's factor for a 64-year-old receiving a 100% JSA (.78) and the age difference between Mr. McFadden and his wife (minus .0083). However, the conversion factor, and resulting benefit, produced by the Plan's formulae are lower than compared to those produced by reasonable actuarial assumptions. For example, using the factor produced by the Treasury Assumptions that were current when he retired (0.8073), Mr. McFadden's benefit would be $916.91 per month, $40.44 more than he is receiving, an increase of 4.61%.  Through their use of unreasonable factors to determine JSA benefits, Defendants reduced the present value of Mr. McFadden's pension benefits by more than $8,000.

75.     Plaintiff David Schmidt started receiving benefits when he and his wife were both age 65.  He selected a 50% JSA, which pays $1,725.01 a month.  His benefits were calculated by multiplying the SLA he was offered, $1,982.77, by .87, the Plan's conversion factor for a 65-year-old participant receiving a 50% JSA.  However, the conversion factor, and the resulting benefit, produced by the Plan's formulae are lower than compared to those produced by reasonable actuarial assumptions.  For example, using the factor produced by the Treasury Assumptions that were current when he retired (.9224), Mr. Schmidt's benefit would be $1,829.05 per month, $104.04 more than he is receiving, an increase of 6.03%.  Through their use of unreasonable factors

to determine JSA benefits, Defendants reduced the present value of Mr. Schmidt's pension benefits by more than $21,000.

76.     Plaintiff Peter Doncevic started receiving benefits at age 61 and his wife was age 62. He selected a 100% JSA, which pays him $274.00 a month. His benefits were calculated by multiplying the SLA he was offered, $342.50, by 0.80, the result of the Plan's factor for a 61-year-old receiving a 100% JSA (.80). However, the conversion factor, and resulting benefit, produced by the Plan's formulae are lower than compared to those produced by reasonable actuarial assumptions. For example, using the factor produced by the Treasury Assumptions that were current when he retired (.8747), Mr. Doncevic's benefit would be $299.59, $25.59 more than he is receiving, an increase of 9.34%. Through their use of unreasonable factors to determine JSA benefits, Defendants reduced the present value of Mr. Doncevic's pension benefits by more than $6,000.

77.     Because their benefits were calculated using formulae based on the UP-84 with setbacks and a 6.5% interest rate, each of the Plaintiffs have been harmed. They are each receiving less each month than he would have received if the Plan used conversion factors based on reasonable, up-to-date actuarial assumptions, like ERISA requires. Plaintiffs, along with each other class member, has been substantially damaged as a result of receiving benefits below an actuarially equivalent amount in violation of ERISA.

78.     In short, Defendants failed to provide JSAs that were actuarially equivalent to the SLA that participants were entitled to receive when they retired as required by ERISA § 205(d), 29 U.S.C. § 1055(d). By using unreasonable formulas based on antiquated actuarial assumptions, Defendants have materially reduced the monthly benefits that participants and beneficiaries under

the Plan receive in comparison to the monthly benefits they would receive if Defendants used factors based on updated, reasonable actuarial assumptions.

## CLASS ACTION ALLEGATIONS

79.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the class (the "Class") defined as follows:

> All participants and beneficiaries of the Plan who began receiving a 50%, 75% or 100% JSA or a QPSA on or after November 11, 2016, whose benefits had a present value that was less than the present value of the SLA they were offered using the applicable Treasury Assumptions as of each participant's Benefit Commencement Date. Excluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plan.

80.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons. According to the Plan's most recent Form 5500, there are over 11,000 retired participants receiving benefits.

81.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all Class members, arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

82.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.     Whether the Plan's existing formulae provide 50%, 75% and 100% JSAs and QPSA benefits that are actuarially equivalent to the SLA participants could have selected;

> B.     Whether the Plan's formulae for calculating JSA benefits are reasonable;

C.    Whether Plaintiffs and Class members should have their benefits recalculated to conform with ERISA's actuarial equivalence requirements; and

D.    Whether Plaintiffs and Class members should receive payments to compensate them for past and future benefit payments that did not and will not satisfy ERISA's actuarial equivalence requirements.

83.    Plaintiffs will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiffs have no interests antagonistic to those of other members of the Class.  They are each committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

84.    This action may be properly certified under either subsection of Federal Rule of Civil Procedure 23(b)(1).  Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

85.    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

86.     If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under Rule 23(b)(3) is appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### FIRST CLAIM FOR RELIEF
### Declaratory and Equitable Relief
### (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

87.     Plaintiffs re-allege and incorporate by reference all prior allegations in this Amended Complaint.

88.     Defendants have improperly reduced JSAs for participants and beneficiaries of the Plan below the amounts that they would receive if those benefits were actuarially equivalent to an SLA in violation of ERISA § 205(d), 29 U.S.C. § 1055(d).

89.     As a result, Defendants have caused a forfeiture of benefits for participants and beneficiaries of the Plan in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

90.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

91.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the methodologies used by Defendants for calculating the actuarial equivalence of JSAs violate ERISA because they do not provide an actuarially equivalent benefit, as required by ERISA § 205(d), 29 U.S.C. § 1055(d), and deprived Plaintiffs of their vested benefits in violation of ERISA § 203(a), 29 U.S.C. 29 U.S.C. § 1053(a).

92.     Plaintiffs seek an order from the Court providing a full range of equitable relief, including but not limited to:

        (a)     re-calculation, correction, and payment of JSA and QPSA benefits previously paid under the Plan;

        (b)     an "accounting" of all prior benefits and payments;

        (c)     an equitable surcharge;

        (d)     disgorgement of amounts wrongfully withheld;

        (e)     disgorgement of profits earned on amounts wrongfully withheld;

        (f)     a constructive trust;

        (g)     an equitable lien;

        (h)     an injunction against further violations; and

        (i)     other relief the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (ERISA §§ 404 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

93.     Plaintiffs re-allege and incorporate by reference all prior allegations in this Amended Complaint.

94.     The Committee is a named fiduciary of the Plan.

95.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent that person "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such

plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. As such, neither "named fiduciary" status, nor formal delegation is required for a finding of fiduciary status, and contractual agreements, such as the governing Plan documents, cannot override a finding of fiduciary status when the statutory test is met.

96.     The Committee and its members are fiduciaries for the Plan because throughout the Class Period they have been named fiduciaries of the Plan, and/or exercised discretionary authority or control respecting the management of the Plan, and/or exercised authority or control over the management or disposition of the Plan's assets, and/or have had discretionary authority or discretionary responsibility in the administration of the Plan.  Among other things, during the Class Period, the Committee had authority or control over the determination of the amount and payment of benefits from the Plan.

97.     Sprint is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control with respect to the management of the Plan, and/or exercised authority or control over management or disposition of the Plan's assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan, including, but not limited to, its duty to appoint and monitor members of the Committee.

98.     ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) requires Defendant-fiduciaries to discharge their duties with respect to the Plan "in accordance with the documents and instruments governing the plan[s] insofar as such documents and plan instruments are consistent with" ERISA.

99.     The Plan's terms are not consistent with ERISA because the Plan uses unreasonable formulae to calculate JSAs and QPSAs that do not provide actuarially equivalent benefits.  As a result, participants and beneficiaries do not receive actuarially equivalent benefits, like ERISA requires, and lose vested benefits in violation of ERISA.

100.     Here, Defendants breached their fiduciary duties by following the Plan terms which violate ERISA because those terms result in participants receiving less than the actuarial equivalent of their vested accrued benefits.

101.     ERISA further imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA.  In allowing the Committee to pay benefits that were not actuarially equivalent, in violation of ERISA, Defendant Sprint breached its fiduciary duty to supervise and monitor the Committee.

102.     As a direct and proximate result of the Defendants' fiduciary breaches, participants in the Plan have lost, and are continuing to lose, millions of dollars in vested accrued pension benefits.

103.     Sprint and the Committee are jointly liable for the acts of the other as co-fiduciaries for the Plan.

104.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

105.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the Plan's established methodologies for calculating JSAs and QPSAs do not provide actuarially equivalent benefits

because they do not provide benefits with an equal present value to the SLA as required under ERISA.

106.     Plaintiffs further seek orders from the Court providing a full range of equitable relief including but not limited to:

(a)     re-calculation, correction, and payment of actuarially equivalent JSA and QPSA benefits previously paid under the Plan;

(b)     an "accounting" of all prior benefits and payments;

(c)     an equitable surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Declare that the Plan has failed, and continues to fail, to properly calculate and pay JSA and QPSA benefits that are actuarially equivalent to the SLA, in violation of ERISA;

C.     Order Defendants to correct and recalculate JSA and QPSA benefits that have been paid under the Plan;

D.      Order Defendants to provide an "accounting" of all prior payments of JSA and QPSA benefits under the Plan to determine the proper amounts that should have been paid;

E.      Order Defendants to pay all benefits improperly withheld, including under the theories of equitable surcharge and disgorgement;

F.      Order Defendants to disgorge any profits earned on amounts improperly withheld;

G.      Impose a constructive trust;

H.      Impose an equitable lien;

I.      Order Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

J.      Award, declare, or otherwise provide Plaintiff and the Class with all relief available under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

K.      Award to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

L.      Any other relief or remedy the Court determines is just and proper.


Dated:  January 18, 2023.                              Respectfully submitted,


                                        /s/ Scott C. Nehrbass

                                        **FOULSTON SIEFKIN, LLP**
                                        Scott Nehrbass, KS #16285
                                        snerhbass@foulston.com
                                        7500 College Blvd, Ste 1400
                                        Overland Park, KS 66210
                                        Telephone: 913.253.2144
                                        Facsimile: 913.498.2101

Jeff P. DeGraffenreid, KS #15694
jdegraffenreid@foulston.com
Boyd Byers, KS #16253
bbyers@foulston.com
1551 N. Waterfront Parkway, Suite 100
Wichita, KS 67206-4466
Telephone: 316.291.9788
Facsimile: 316.267.6345

**IZARD, KINDALL & RAABE LLP**
Robert A. Izard (*pro hac vice*))
Douglas P. Needham (*pro hac vice*)
Oren Faircloth (*pro hac vice*)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
rizard@ikrlaw.com
dneedham@ikrlaw.com
ofaircloth@ikrlaw.com

***Counsel for Plaintiffs***